UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                                                          Bankruptcy No. 06-30242
                                                                                Chapter 7
Graydon Bell and Sherry Bell,

          Debtors.
_____/

MBNA America Bank, N.A.,

          Plaintiff,

    vs.                                                                        Adversary No. 06-7042

Sherry Bell,

          Defendant.
_____/

**MEMORANDUM AND ORDER**

By Complaint filed August 18, 2006, Plaintiff MBNA America Bank, N.A. initiated this adversary proceeding seeking a determination that the credit card debt owed by Debtor/Defendant Sherry Bell is nondischargeable pursuant to section 523(a)(2) of the Bankruptcy Code. By Answer filed October 24, 2006, Sherry Bell denies the allegations.

The matter was tried on January 25, 2007. The following constitutes the Court's findings of facts and conclusions of law.

I.  FINDINGS OF FACT

Graydon and Sherry Bell have four minor daughters, and Sherry is a full-time homemaker.

Graydon was a partner in Bell Farms, LLP. Although a full understanding of the details and timeline of Bell Farms cannot be had from the evidence presented at trial, it was a multi-state hog operation that was ultimately taken over by another company. Graydon's employment history also

includes work as a human resources director for Greenberg Roofing from 2004 until he began his current job as a commodities broker for Commodity Services, Inc., in September 2005.

The Bells' 2004 tax return listed their total income as $-2,750,160.00. Sherry Bell testified that although she signed it, she did not read the 62-page return. She testified she could not "make heads or tails of it." In 2005, the Bells had a total income of $-2,658,340.00, but Sherry testified she was unaware of that fact until it was mentioned at trial. As with the 2004 return, she testified she did not read the 2005 tax return before signing it.

Sherry received a pre-approved application for an MBNA credit card in her name in the mail, and called MBNA to open the account on December 26, 2005. She told the call processor that she earned an annual salary of $50,000.00. At trial, Sherry explained that she arranged company meetings and parties for Graydon's employer,[1] and in return Graydon gave her a portion of his income according to an informal agreement between the two of them. The credit card application also lists total household income as $50,000.00. Sherry gave her husband's cellular telephone number as her work telephone number. The application includes numerous fields that were left blank, including years at residence, rent/own/buy, monthly payment, current employer, current position, years there, previous employer, previous position, previous annual salary, previous years there, references, and others.

Sherry testified that when she accepted the preapproved credit offer, she had no idea she and Graydon had lost $2.7 million the previous year. She was aware the market had been down, but Bell Farms was one of the 13 largest companies of its kind in the nation, and Sherry did not realize she

---

[1] It is unclear from her testimony whether Sherry made these arrangements for Bell Farms, Greenberg Roofing, or Commodity Services, Inc.

2

and Graydon were having financial difficulties. She testified that she never asked Graydon whether they were making money or not, and Graydon testified that he and Sherry did not discuss what he was earning in any detail.

On February 21, 2006, a judgment was entered against Graydon, in favor of Estate of Vincent Murphy, et al., in the amount of $2,433,288.88.[2] Graydon testified that he did not tell Sherry about the judgment.

On March 8, 2006, Sherry took a $7,000.00 cash advance from the MBNA credit card. She used most of the cash to buy airplane tickets for her and the Bells' four daughters to travel to South Carolina to see Sherry's grandmother who had suffered a stroke. Sherry did not know if she would see her grandmother again. Any remaining money from the cash advance was used for living expenses.

Sherry testified that she did not ask Graydon whether they could afford the cash advance because the income they were receiving had not changed as far as she knew, and she planned to repay the advance with Graydon's income. Graydon testified he knew Sherry bought the tickets but not where she got the money for them.

Graydon testified that he first consulted an attorney about the possibility of bankruptcy in either late March or early April 2006. The Bells filed their Chapter 7 bankruptcy petition on June 8, 2006.

---

[2] The judgment was also entered against John Bell and Richard Bell. Vincent Murphy was a former partner in Bell Farms. He had loaned the partnership money in return for personal guaranties by John Bell, Richard Bell, and Graydon Bell.

## II.  CONCLUSIONS OF LAW

The Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A).[3]  To prevail in a nondischargeability action under section 523(a)(2)(A), a creditor must prove by a preponderance of evidence that: (1) the debtor made a false representation;  (2) the debtor knew the representation was false at the time it was made; (3) the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained loss and damage as a proximate result of the representation having been made.  Lindau v. Nelson, (In re Nelson), 2006 WL 3391437, at *3 (B.A.P. 8th Cir. Nov. 24, 2006); Clauss v. Church (In re Church), 328 B.R. 544, 547 (B.A.P. 8th Cir. 2005); Valley Memorial Homes v. Hrabik (In re Hrabik), 330 B.R. 765, 772 (Bankr. D.N.D. 2005).

---

[3] Subsection (B) of section 523(a)(2) provides for nondischargeability of money, property, services or credit obtained by the use of a written statement respecting the debtor's financial condition that is materially false.  11 U.S.C. § 523(a)(2)(B) (the other two elements under section 523(a)(2)(B) are the creditor's reasonable reliance on the statement and the debtor's intent to deceive).  Subsections (A) and (B) of section 523(a)(2) are mutually exclusive. Rose v. Lauer (In re Lauer), 371 F.3d 406, 413 (8th Cir. 2004).  Although MBNA's Complaint seeks relief under section 523(a)(2) without specifying subsection (A) or (B), counsel for MBNA clarified at trial that it seeks a determination of nondischargeability under 523(a)(2)(A).

The representation at issue is that Sherry would repay the $7,000.00 cash advance.[4] The element of representation is implied from the mere use of a credit card. First Bank Sys. v. Foley, (In re Foley), 156 B.R. 645, 649 (Bankr. D.N.D. 1993).

Proof that a debtor knew a representation was false at the time it was made and that it was made with an intent to deceive the lender focuses solely upon the debtor's intent at the time the charges and draws were made. Id. In such situations the requisite intent to deceive may be inferred from objective factors suggesting that a debtor knew or should have known that she would be unable to make repayment. See Universal Bank, N.A. v. Grause (In re Grause), 245 B.R. 95, 99 (B.A.P. 8th Cir. 2000) (stating that because direct proof of intent, i.e., the debtor's state of mind, is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred). Some of the circumstances to which the Court can look to determine intent include:

1) the length of time between the charges made and the filing of the bankruptcy;
2) whether an attorney has been consulted concerning the filing of bankruptcy before the charges were made;
3) the number of charges made;
4) the amount of the charges;
5) the financial condition of the debtor at the time the charges were made;
6) whether the charges were above the credit limit of the account;
7) whether the debtor made multiple charges on the same day;
8) whether or not the debtor was employed;
9) the debtor's prospects for employment;
10) the debtor's financial sophistication;
11) whether there was a sudden change in the debtor's buying habits; and
12) whether the purchases were made for luxuries or necessities.

---

[4] The Court notes that the statement at issue is not Sherry's statement to the call processor that she had an income of $50,000.00. That statement involves her financial condition, and section 523(a)(2)(A) only applies to statements other than those involving a debtor's financial condition.

5

Id.; Citibank S.D. v. Meseck (In re Meseck), 284 B.R. 901, 906-07 (Bankr. N.D. Iowa 2002). The factors enumerated are nonexclusive, no single factor is dispositive, and a debtor's conduct need not satisfy a certain number of factors to prove fraudulent intent. Id. at 100-101. Instead, a creditor must show that on balance, the evidence supports a finding of fraudulent intent. Id. at 101. "Factor counting" is inappropriate when applying a subjective standard; rather, the factors are intended to aid the court in determining the debtor's state of mind when he or she represented the intention to repay. Id.

     The circumstances surrounding the cash advance in this case, when considered together, do not support a finding of an intent to deceive. The cash advance was taken three months prior to the Bells' bankruptcy filing and before Graydon consulted an attorney concerning the possibility of filing for bankruptcy. Although the amount of the cash advance was significant, there was only one. The Bells had financial problems at the time Sherry took the cash advance, but Sherry was unaware of their financial condition generally and of the $2.4 million judgment entered against them specifically. Sherry did not make charges or cash advances above the credit limit, nor did she make multiple charges on the same day. Although she was not employed outside the home and had no prospect of such employment, she reasonably believed Graydon's income would provide the basis for repayment. There is no evidence that Sherry has any financial sophistication or that there was a sudden change in her buying habits. Although the Court might deem a trip to South Carolina for a debtor and her four daughters a luxury under other circumstances, in this case, the trip was for the sole purpose of seeing Sherry's grandmother who had suffered a stroke and might not survive. The Court does not deem this a luxury expense.

The circumstances weighing in favor of Sherry are bolstered by Sherry's testimony—which the Court deems credible—that she intended to repay MBNA with Graydon's income. Therefore, MBNA failed to sustain its burden of proving that Sherry intended to defraud it at the time the advance was made against the account. Because the element of intent has not been met, MBNA's claim under section 523(a)(2)(A) fails.

For the foregoing reasons, the Complaint of MBNA America Bank, N.A., based on section 523(a)(2)(A) is dismissed.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this February 9, 2007.

**WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT**

7